**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LaSHAWNDA YOUNG, Individually, | ) | |
| and as Special Administrator of the | ) | |
| Estate of Divonte Young, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 5651 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

After more than two years of discovery, this civil rights case comes before the court on

the plaintiff's motion for a rule to show cause for alleged noncompliance with a subpoena

directed to the Chicago Independent Police Review Authority dated May 6, 2016.  For the

reasons that follow, the court grants the motion, finds that privilege claims have been waived,

orders production of the documents in dispute, and sets a hearing on Plaintiff's request to recover

her reasonable attorney's fees incurred in enforcing the subpoena.

### I. Background

On August 9, 2012, Chicago Police Department ("CPD") Officer Otis Watts shot Divonte

Young ("Young").  (City Ans. ¶ 4, ECF No. 79; Individual Defs.' Ans. ¶ 4, ECF No. 80.)

Alleging that Young was unarmed at the time, his mother, Plaintiff LaShawnda Young

("Plaintiff") has sued Watts, the City, and three additional CPD officers under 42 U.S.C. § 1983

for allegedly violating Young's Fourth and Fourteenth Amendment rights.  Plaintiff also brings

survival and wrongful-death claims under Illinois law.

The instant dispute involves the Independent Police Review Authority ("IPRA").  In 2007, the City of Chicago disbanded the CPD's former Office of Professional Standards and created IPRA.  *See* City of Chicago Ordinance § 2–57–020.  IPRA operates as an independent agency reporting directly to the mayor.  *See id.*; *Thomas v. City of Chi.*, No. 11 C 09275, 2013 WL 1345396, at *4 (N.D. Ill. Mar. 29, 2014) (citing *Obrycka v. City of Chi.*, No. 07 C 2372, 2012 WL 601810, at *3 n. 2 (N.D. Ill. Feb. 23, 2012); *see also* Chicago Muni. Code § 2-57-020 (stating that IPRA is an "office of the municipal government" of the City of Chicago).  IPRA investigated the Young shooting.  Its formal investigation lasted from the date of the shooting until January 3, 2014, when IPRA formally closed its investigative file.  (Aff. of Claudia Silva ¶ 11, ECF No. 156-1, Ex. A at *901.)[1]  On January 21, 2014, IPRA posted on its website a redacted version of its investigative report.  (Silva Aff. ¶ 8.)  Plaintiff has not named IPRA as a defendant.

Discovery began on or around January 31, 2014, and Plaintiff has yet to take depositions.  On October 27, 2015, Plaintiff filed a motion to compel the deposition of the person responsible for gathering the City's discovery responses that had been produced by that date.  (ECF No. 113.)  The motion, among other things, described Plaintiff's discovery requests as "comprehensive, seeking all documents relative to the shooting of Divonte Young and the subsequent investigation."  (ECF No. 113 at 2.)  Plaintiff's attorney, H. Candace Gorman ("Gorman"), set forth her reasons for believing that additional responsive documents and tangible things exist.  (*See id*. at 2–3.)  For instance, she stated that she learned from reviewing documents produced in June 2015 of a video of an interview with Laura Moore, a witness, even though the City's assistant corporation counsel previously represented that no additional videos

---

[1] "*" pinpoint citations reference CM/ECF Page ID numbers.

of interviews with witnesses existed. (*See id*. at 3.) The City eventually produced videos of Moore's interviews. (*Id*.)

In May 2016, Gorman learned for the first time that the assistant corporation counsel representing the City, Matthew Hurd ("Hurd"), could not confer directly with IPRA. (Pl.'s Am. Rule to Show Cause 2, ECF No. 149.) As a result, she delivered a subpoena on May 6, 2016, to a paralegal at IPRA ("the subpoena"). The subpoena commanded "IPRA" to produce the following documents at Gorman's office at 2:00 p.m. on May 20, 2016: "The complete investigative file for the incident that occurred on August 9, 2012 resulting in the death of Divonte Young. Plaintiff seeks all investigative documents including but not limited to internal communications, external communications, e-mails, notes, facsimilies (sic)." (ECF No. 149 Ex. A at 1.) In a letter dated May 17, 2016, paralegal Laniya Moore ("Moore") advised Gorman that IPRA "is an agency of the City of Chicago" and that "you will need to contact the City's attorneys . . . for any information pertaining to this matter." (ECF No. 131-3 at 1.) No documents were produced on May 20, 2016.

Plaintiff filed a Motion to Enforce the Subpoena on June 3, 2016. (ECF No. 131.) The request for relief in that motion repeated the language of the subpoena, asking the court to "enforce the subpoena . . . and require IPRA to immediately turn over, *directly to counsel for the Plaintiff*, the complete investigative file. . . ." (*Id*. at 3.)

The court held a hearing on that motion on June 8, 2016, at which Gorman and Hurd appeared. Hurd stated that he did not oppose granting the motion to enforce, and the court granted the motion. The minute order granting the motion did not set a deadline to comply with the subpoena. (*See* ECF No. 133 at 1.)

Claudia Silva, an attorney for IPRA, states that she was assigned to respond to Plaintiff's subpoena on or around June 21, 2016. (Silva Aff. ¶ 11.) The Chicago Police Department controls the servers on which IPRA e-mail messages are stored. (Silva Aff. ¶ 14.) On July 7, 2016, Silva asked the CPD to search its servers for messages from August 9, 2012, to that date matching certain terms. (Silva Aff. ¶ 15.) Silva states that she "drafted the request for e-mails to be much broader than the scope of the Subpoena to insure that all potentially responsive e-mails would be located and with the intention that I would review the results of CPD's e-mail search and produce records that were responsive. . . ." (Silva Aff. ¶ 16.) Silva sent Gorman an e-mail message on July 14, 2016, at approximately 1:11 p.m. (ECF No. 156-1 at *909.) In that message, Silva told Gorman that "[t]here are approximately 600-700 e-mails plus multi-page attachments attached to some of the e-mails. We will be reviewing the information, creating a privilege log and making any necessary redactions. We are looking into having an outside vendor help us as there is a lot of material to go through." (*Id.*) Silva avers that she intended the 600-to-700-message number as an estimate and that she did not mean to convey that she had determined that all of the material that matched her search terms was responsive to the subpoena. (*See* Silva Aff. ¶¶ 18–19.) The City retained a vendor to assist with the process of responding to the subpoena. (Silva Aff. ¶22.) The vendor's system created 972 records, separating messages and attachments, based on the e-mail messages matching Silva's search terms. (*Id.* ¶ 19.) Silva sent Gorman another e-mail message on July 18, 2016, stating that the vendor would take between seven and ten days to prepare the records for review. (ECF No. 156-1 at * 911.) Silva further stated that "we will require some turn around time in order to review the data for responsive documents." (*Id.*)

The court held a status hearing on July 29, 2016. Gorman advised that she had yet to receive the investigative file, and the court ordered that "[t]he information that the court previously ordered the City to provide, shall be produced by 8/26/16." (ECF No. 138 at 1.)

The City retained attorneys at Jackson Lewis, P.C., ("Jackson Lewis") to assist in reviewing the matching e-mail messages and other material located by Silva, identifying responsive material, and producing a privilege log. (Silva Aff. ¶26.) The City, through counsel at Jackson Lewis, produced documents, including paper documents and an audio recording located by Silva, on August 26; August 29; and September 1, 2016. (*See* Silva Aff. ¶¶ 27–34.) The City also tendered a privilege log on August 26, 2016. (*Id*. ¶ 27.) It initially withheld 34 of the 88 documents it then deemed responsive. (*Id*.) In a separate e-mail message dated August 29, 2016, an attorney with Jackson Lewis supplied two examples of records deemed nonresponsive: responses to Freedom of Information Act requests in January and March 2016 listing IPRA cases, including the case number of the Young investigation. (*See* Silva Aff. ¶ 32.) Upon further reflection, the City effectively withdrew its claims of privilege as to all but five records on September 1, 2016. (*See* Silva Aff. ¶ 35; Letter from P. Rocks to Gorman, Sept. 1, 2016, ECF No. 156-1, Ex. F at *940.)

Communications between counsel and production of documents continued over the next month-and-a-half. The City produced supplemental documents on October 4, 10, and 11, 2016, including some documents it deemed to be duplicative of those already produced. (*See* Silva Aff. ¶¶ 38–39.) The City also sent Gorman a spreadsheet listing approximately 400 records it considered nonresponsive and offered to allow Gorman to select a few documents to review. (*See id*. Ex. H; E-mail from P. Rocks to Gorman, Oct. 10, 2016, ECF No. 156-1 at *959.) The City, however, took the position that the nonresponsive material totaled 170,000 pages, and

producing those pages would be unduly burdensome given the cost of reviewing them to create a

privilege log. (E-mail from P. Rocks to Gorman, Oct. 10, 2016, ECF No. 156-1 at *959.)

Plaintiff filed her original motion for rule to show cause on September 15, 2016. She

amended that motion on October 26, 2016. The motion has been fully briefed, the City has filed

a surresponse, and Plaintiff has filed a sureply.[2]

## II. Analysis

In the instant motion, Plaintiff asks the court to enter a rule to show cause, impose

sanctions, and order full compliance with the subpoena, by which she means the turnover of all

documents withheld as nonresponsive and based on a claim of privilege. More specifically, she

urges the court to rule that the City has waived its privilege objections and that documents

created after IPRA officially closed its investigation are responsive to the subpoena. She also

seeks her reasonable attorney's fees. The City responds that it has complied fully with the

subpoena, properly construed. It asserts that it produced a privilege log within a reasonable time.

Before the court can address those issues, it must determine the applicable procedural standard, a

task complicated by Plaintiff's use of the rule-to-show-cause device and the undeveloped record

on IPRA's relationship with the City.

### A. Legal Standards

Plaintiff does not cite Rule 45 or any other provisions of the Federal Rules of Civil

Procedure, but three times in the instant motion, she asks the court to "enter this Amended Rule"

---

[2] The motions for leave to file a surresponse and a sureply will be granted, as more fully explained below. In reaching its decision today, the court has considered the arguments made in the City's surresponse, the Plaintiff's sureply, and the accompanying exhibits for their proper purposes, *see infra* note 6, and, except as discussed below, those arguments do not alter the court's rulings. In particular, the City's waiver of claims of privilege means that there is no need to analyze the deliberative-process privilege in depth, as Judge Chang did in *Holmes v. Hernandez*, No. 14 C 8536, 2016 U.S. Dist. LEXIS 167209 (N.D. Ill. Nov. 21, 2016). To the extent Plaintiff is seeking relief in her sureply not requested in her motion, that request is not properly before the court. She now requests an order directing "IPRA to tender signed 'litigation hold' documents insuring that every individual who worked on this investigation . . . has conducted a diligent search for documents and has tendered all documents . . . ." Nothing prevents Plaintiff from seeking that relief by separate motion, but briefing must end somewhere.

or "enter the Rule," order the City to comply fully with the subpoena, and sanction it. (ECF No. 149 at 1, 8, 15.) Her motion raises two procedural issues. First, Plaintiff apparently treated IPRA as a nonparty when she issued the subpoena, but it is an "office of the municipal government" of the City of Chicago, a party. Chicago Muni. Code § 2-57-020. Second, Plaintiff's use of the rule-to-show-cause procedure means the court cannot impose sanctions at this juncture.

1. IPRA's Party Status

Federal Rule of Civil Procedure 45 governs subpoenas, which are typically directed to nonparties, while Rule 34 governs requests for production of documents and tangible things directed to a party. *See Neal v. Dana Corp.*, No. 1:01-CV-393, 2002 WL 32144315, at *1 (N.D. Ind. June 5, 2002). "Though the rules do not say so expressly, a subpoena is not necessary if the person [from whom documents are sought] is a party". *Id.* (citation omitted) (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2107 (3d ed. 1998)).

On its face, the subpoena here commands "IPRA," a nonparty, to produce documents, but that command came in the midst of what Gorman refers to as "fundamental confusion" over IPRA's role. (ECF No. 149 at 11.) According to Gorman's undisputed representations, she served the subpoena only after Hurd told her that he could not communicate directly with IPRA employees about her requests for production of documents as he represents the City of Chicago. Gorman then treated IPRA as a nonparty when she drafted the subpoena. After she served it, however, Moore told her she had to go back to the place where she started: the Office of the Corporation Counsel and, presumably, Hurd, who works for that office. Given the circles in which Gorman found herself running, and the City's responsibility for that confusion, her use of a third-party discovery device is understandable.

The subpoena may nevertheless be in substance a request for production directed to the City of Chicago. *See Neal*, 2002 WL 32144315, at *1. In federal court, state law determines whether a party is amenable to suit. *See* Fed. R. Civ. P. 17(b). "To be sued in Illinois, a defendant must have a legal existence, either natural or artificial." *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 978 n.2 (7th Cir. 2000) (citing *Magnuson v. Cassarella*, 812 F. Supp. 824, 827 (N.D. Ill.1992)). For instance, the Chicago Police Department "has no separate legal existence apart from the City of Chicago, and the department is therefore not a suable entity." *Harrison v. City of Chi.*, No. 05 C 2680, 2005 WL 3542576, at *2 (N.D. Ill. Dec. 22, 2005) (quoting *Chan v. City of Chi.*, 777 F. Supp. 1437, 1442 (N.D. Ill.1991)). A county sheriff's office, by way of contrast, "has a legal existence separate from the county and the State, and is thus a suable entity" in Illinois. *DeGenova,* 209 F.3d at 978 n.2. The ordinance that created IPRA declares it to be an "office of the municipal government" of the City of Chicago. In their affidavits, Silva and IPRA's Director aver that it is a department of the City of Chicago. (Silva Aff. ¶ 3; Fairley Aff. ¶ 3.) All of this provides some reason to think that Plaintiff's subpoena to IPRA was in substance a request for production of documents directed to the City of Chicago.[3] *See Giles v. Ludwig*, No. 12-CV-6746, 2014 WL 4358475, at *3 (denying summary judgment to the City of Chicago based on plaintiff's theory attributing a custom of IPRA to the City under *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

The parties have not briefed the relationship, legal or formal, between the City and IPRA, however, and the court need not decide definitively whether IPRA is separately amenable to a

---

[3] Illinois municipal law lends further credence to this conclusion. The Illinois Cities and Villages Act provides that the City of Chicago's corporation counsel shall be and act as the legal adviser of the city council and of the several officers, boards and departments of the city. He shall appear for and protect the rights and interests of the city in all actions, suits, and proceedings brought by or against it or any city officer, board or department, including actions for damages when brought against such officer in his official capacity. 65 ILCS 20/21-11; *see also Bonilla v. City Council of City of Chi.*, 809 F. Supp. 590, 602 (reasoning that this provision implied commonality of interest between City and its corporation counsel).

subpoena now. Rules 45 and 37 expressly provide contempt as a remedy for failing to obey, respectively, an order enforcing or related to a subpoena, Fed. R. Civ. P. 45(g), or a discovery order directed to a party, *id*. R. 37(b)(2)(A)(vii). Rule 37 allows the court some remedies not expressly enumerated in Rule 45, such as "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," *id*. R. 37(b)(2)(A)(ii), but Plaintiff does not seek any of those remedies. As explained more fully below, the parties' dispute over waiver and the scope of responsive documents comes out the same under Rules 45 and 37. The court therefore analyzes Plaintiff's request for a show-cause order on the contempt grounds raised in the briefing before it.

2. <u>Use of Show-Cause Device and the Propriety of Awarding the Relief Requested</u>

The party seeking an order of civil contempt must establish four things: "(1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *S.E.C. v. Hyatt*, 621 F.3d 687, 692 (citing *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)). An order of civil contempt, as contrasted with criminal contempt, serves the dual purposes of compensation and coercing compliance. *Id*. (citation omitted).

Strictly speaking, the pending motion facially presents only the question of whether a hearing should be set at which the City will be required to show cause why it should not be held in contempt for violating the court's June 7, 2016, order enforcing the subpoena.[4] *See id*. at 695; *Sommerfield v. City of Chi.*, 252 F.R.D. 407, 413 (N.D. Ill. 2008) ("The purpose of [a show-

---

[4] Plaintiff cites two cases decided by the Supreme Court of South Carolina to establish this court's authority to enter a rule to show cause. *Curlee v. Howle*, 287 S.E.2d 915 (S.C. 1982); *Henderson v. Henderson,* 379 S.E.2d 125, 129 (S.C. 1989). These cases have no bearing on the proper procedure to be followed in this court. *See* Fed. R. Civ. P. 1.

cause] motion is to persuade the court that there should be a hearing at which the factfinder will ultimately evaluate whether a finding of contempt is appropriate on the evidence presented."). "The factual determination that sets the [contempt] proceedings in motion is perhaps best described as a preliminary assessment that the facts presented implicate defendants in violation of the court's order." *Sommerfield*, 252 F.R.D. at 413–14 (quoting *Cent. States v. Transcon Lines*, No. 90 C 1853, 1993 U.S. Dist. LEXIS 12427, at \*7 (N.D. Ill. Sept. 7, 1993) (first set of brackets omitted).

The Seventh Circuit has described a "motion for a rule to show cause . . . [as] an unnecessary extra layer of process" in light of the more expeditious procedures available after the adoption of the Federal Rules of Civil Procedure. *Hyatt*, 621 F.3d at 695; *see also id*. at 695–96 (discussing historical use of motions for a rule to show cause and describing them as obsolete); *Mosely v. City of Chi.*, 252 F.R.D. 421, 423 n.1 (N.D. Ill. 2008) ("The application for a rule to show cause is superfluous in light of Rule 7(b) of the Federal Rules Of Civil Procedure.") (citation omitted). Nonetheless, entering an order requiring compliance with a subpoena before entering a contempt order is the preferred practice. *Hyatt*, 621 F.3d at 695 (citation omitted). In its response, the City takes Plaintiff's request for a show-cause order seriously, reciting the standard applicable to such a request.

Plaintiff's motion expressly requests a contempt finding, an order requiring turnover, and sanctions, however. The issues in dispute have been fully briefed. The matters raised do not call for the resolution of disputed factual issues. Rather, the parties ask for rulings on the scope of the subpoena and a waiver question premised on actions taken in open court. Accordingly, the City will not be prejudiced by the court's resolution of those issues without a hearing. *See Hyatt*, 621 F.3d at 696 ("In certain limited circumstances, a district court may treat a show-cause

motion as a motion for an order on the merits of the alleged contempt where doing so would not cause prejudice—that is, when it would not violate the alleged contemner's right to notice and an opportunity to be heard." (citations omitted)); *Sommerfield*, 252 F.R.D. at 414 (concluding that "it is as though the rule to show cause had been granted" because plaintiff requested a contempt finding in its motion and the issues were fully briefed). Thus, Plaintiff's use of the show-cause device here does not necessarily hamstring the court's ability to adjudicate the parties' waiver, scope, and sanctions disputes. Nonetheless, as explained below, the procedural posture of this case counsels in favor of holding a hearing on Plaintiff's request for sanctions.

**B. The City Has Waived Its Privilege Claims**

Rule 45 requires a person commanded to produce documents by a subpoena to serve a written objection "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). The serving party may then move to compel compliance with the subpoena. *Id*. R. 45(d)(2)(B)(i). Rule 45(e) specifies additional requirements when a person withholds subpoenaed material based on a claim of privilege or work-product protection, including a requirement that the person "expressly make the claim," Fed. R. Civ. P. 45(e)(2)(A)(i), and prepare a privilege log, *see also id*. R. 45(e)(2).

When a party propounds a request for production of documents to another party, *see* Fed. R. Civ. P. 34(a)(1), the responding party generally "must respond in writing within 30 days after being served." Fed. R. Civ. P. 34(b)(2)(A). An objection to a request for production of documents must be stated "with specificity," *id*. R. 34(b)(2)(B), and like Rule 45, Rule 26 obliges a party responding to discovery to claim a privilege expressly and prepare a privilege log, *Mosely v. City of Chi.*, 252 F.R.D. 445, 452 (N.D. Ill. 2008) (citing Fed. R. Civ. P. 26(b)(5) and *Hobley v. Burge*, 433 F.3d 946, 947, 951 (7th Cir. 2006)) (other citation omitted). Together,

Rules 45 and 26(b)(5) give a party or subpoenaed nonparty responding to discovery a choice: prepare an adequate privilege log or risk an order compelling disclosure of the allegedly privileged material. *See, e.g.*, *Mosley*, 252 F.R.D. at 449 n.5 (under Rule 45, someone served with a subpoena "can either prepare a privilege log or waive any claim of privilege."); *Flood v. Dominguez*, No. 2:08–CV–153–PPS–PRC, 2011 WL 578656, at *2 (N.D. Ind. Feb. 9, 2011) (citing Rule 26(b)(*5) for the proposition that "[a] party's failure to produce a requisite privilege log may result in the waiver of any privilege").

The City did not timely object or prepare a privilege log here. Gorman served the subpoena 14 days before its return date of May 20, 2016. The only response from the City or IPRA before that deadline came from Moore on May 17, 2016. (ECF No. 131-3 at 1, Ex. C.) Moore did not assert a privilege, however. Instead, she referred Gorman to the corporation counsel's office. (*See id.*) Moore did not tender a privilege log or object with specificity. *See* Fed. R. Civ. P. 34(b)(2)(B). Neither did Hurd. Instead, Hurd agreed in open court to the entry of an order enforcing the subpoena on June 8, 2016, without objecting or making a privilege claim. The City produced a privilege log more than two-and-a-half months later on August 26, 2016, but by then, the 14-day window of Rule 45(d)(2)(B) and the 30-day window of Rule 34(b)(2)(A) had closed. Consequently, unless excused, the City's failure to object timely to the subpoena here prevents the city from raising a privilege claim now. *See, e.g., Ott v. City of Milwaukee*, 682 F.3d 552, 558 (7th Cir. 2012) (holding waiver occurred and castigating respondents to subpoena for "not offer[ing] any reason for failing to spell out all of their objections in their initial or amended motion to quash"); *Kronenberg v. Baker & McKenzie LLP*, 747 F. Supp. 2d 983, 996 (N.D. Ill. 2010) (citing *Patterson v. Chi. Ass'n for Retarded Children*, No. 96 C 4713, 1997 WL 323575 at *3 (N.D.Ill.1997)) (holding the plaintiff's "failure to object to the subpoena

initially or to object to the production thereafter on some privilege ground precludes him from raising a claim of privilege to the document that was produced").

The City argues that the sanction of waiver should not be imposed because it promptly prepared a privilege log after it located the allegedly privileged documents. "A court may excuse untimely objections 'in unusual circumstances and for good cause.'" *WM High Yield v. O'Hanlon*, 460 F. Supp. 2d 891, 894 (S.D. Ind. 2006) (quoting *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal. 2005) (construing Rule 45)). Furthermore, finding a waiver of a privilege for procedural violations "is a harsh sanction." *Romary Assocs., Inc.* v. *Kibbi LLC*, No. 1:10-CV-376, 2011 WL 4005346, at *3 (N.D. Ind. Sept. 8, 2011) (citing *Wilson v. Kautex*, No. 1:06-CV-60, 2008 WL 162645, at *3 (N.D. Ind. Jan. 14, 2008)). It "may only be imposed where a party displays willfulness, bad faith, or fault." *Am. Nat'l Bank & Trust Co.* v. *Equitable Life Assur. Soc'y of U.S.,* 406 F.3d 867, 877 (7th Cir. 2005) (quoting *Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir.1997)). Good-faith efforts to comply generally weigh against finding waiver while "evidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules supports finding waiver." *Romary Assocs.*, 2011 WL 4005346, at *3 (quoting *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001)). The record here supports findings of willfulness, bad faith, and fault.

The City focuses on its conduct in and after July 2016 to establish its good faith, but it makes no effort to justify the delay of over six months before that time. When Hurd told Gorman in May 2016 that City policy prevented him from communicating with IPRA personnel regarding her discovery requests, a motion to compel had been on file for over six months. (*See* ECF No. 113, filed Oct. 27, 2015.) The City produced additional documents on December 16, 2015 (ECF No. 117 at 1), and on February 10, 2016, the parties told the court that third parties

would review the outstanding discovery issues (ECF No. 124 at 1). Gorman advised the court that the parties needed additional time to work on discovery issues on March 11, 2016 (ECF No. 125 at 1). The City has not explained the six-month delay in advising Gorman of the wall between IPRA and the corporation counsel's office, forcing the court to conclude that it can best be explained by bad faith foot dragging on the City's part. *See Ritacca*, 203 F.R.D. at 335–36 (finding waiver in part because party waited more than four months during discovery discussions to raise possibility of privilege claims and took actions during discovery that appeared to be stalling tactics designed to thwart disclosure of documents). The City's bad faith distinguishes this case from several others in which a party's good-faith efforts to communicate about discovery made a finding of waiver inappropriate for a failure to comply with the technical requirements of procedural rules. *See, e.g.*, *Miller v. City of Plymouth*, No. 2:09–CV–205–JVB–PRC, 2011 WL 1740154 at *2 (N.D. Ind. 2011) (declining to impose waiver sanction in part based on "ongoing correspondence . . . from the time the discovery was served to the time the responses were served and filed"); *Romary Assocs.*, 2011 WL 4005346, at *3–5 (finding waiver to be an inappropriate sanction where party delayed by only one and a half months, discovery had not closed, and opposing party suffered no prejudice from delay); *Guzman v. City of Chicago,* No. 09 C 7570, 2011 WL 55979, at *2 (N.D. Ill. Jan. 7, 2011) (holding fact that the City waited until response to motion to compel to attach proper privilege affidavit did not warrant waiver sanction); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 51-52 (S.D.N.Y. 1996) (declining to find waiver for failure to object timely where "cooperation, not contention" typified the parties' efforts to resolve their dispute).

Once the subpoena was served, the City either willfully waived the privilege or is at fault for its failure to object timely. The IPRA paralegal who received the subpoena sent Gorman a

letter referring her to Hurd (actually, the corporation counsel's department for which Hurd

works) for all inquiries related to the subpoena.  Hurd, in turn, agreed in open court after the

subpoena's return date to the entry of an order granting a motion to enforce the subpoena.

Nothing in the record suggests that the City had any intention of complying with the subpoena

before the court ordered it to do so.  Hurd never asked for additional time to respond or

suggested that a privilege was in play in open court in June 2016.  According to her affidavit,

Silva, an attorney for IPRA, was not assigned to begin responding to the subpoena until

approximately one month after the subpoena's return date and thirteen days after the hearing at

which the court entered an order enforcing the subpoena.  (*See* Silva Aff. ¶ 11.)  Another sixteen

days passed before Silva sent a request to the CPD to search for responsive e-mail messages.

(*See id*. ¶ 15.)  The City took more than two months to tell Gorman and the court that it intended

to create a privilege log without mentioning the deadline set by Rule 45 or 34.  *See, e.g., United*

*Auto. Ins. Co. v. Veluchamy*, 747 F. Supp. 2d 1021, 1027 (N.D. Ill. 2010) (holding on

reconsideration that failure to prepare a privilege log within the time required by the rules

waived privilege claims); *Nye v. Sage Prods , Inc.*, 98 F.R.D. 452, 454 (N.D. Ill. 1982) (finding

plaintiffs waived work-product protection because they "did not mention the work-product rule

in responding to Sage's request to produce" documents).  The City then took another month (up

to three by that point) before it produced a first set of responsive documents and an initial

privilege log, which, as far as the court can tell, it revised only after prompting from Gorman.

Nothing in the record suggests any urgency on the part of IPRA personnel about the subpoena's

return date or the court's order enforcing the subpoena.  Rather, IPRA's referral of this matter to

Hurd, Hurd's acquiescence in the entry of an order enforcing the subpoena without objection,

and the City's lack of urgency for more than two months after the subpoena's return date

(factoring in, as well, the six-month delay to that point) either show that the City willfully waived its privilege claims or that the City is at fault for its waiver. *See Ritacca*, 203 F.R.D. at 335–36 & n.4 (finding waiver where, among other things, party made only general privilege objections for more than four months before producing privilege log); *Applied Sys., Inc. v. N. Ins. Co. of N.Y.*, No. 97 C 1565, 1997 WL 639235, at *2–3 (N.D. Ill. Oct. 7, 1997) (finding waiver where responding party produced nothing for two months after initial discovery request and stating that "[t]his is no minor procedural violation; nor is it indicative of a good faith attempt to meet [the discovery] request"); *Jones v. Ada S. McKinley Cmty. Servs.*, No. 89 C 0319, 1989 WL 152352, at *4 (N.D. Ill. Nov. 28, 1989) (finding waiver where defendant did not object at all by Rule 34 deadline, failed to object on two other occasions, and took two months to raise work-product objections).

As the Seventh Circuit has stated, "Rule 45 'require[s] the recipient of a subpoena to raise all objections at once, rather than in staggered batches, so that discovery does not become a game.'" *Ott*, 682 F.3d at 558 (quoting *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir.1998). From Gorman's perspective, discovery became a game here. The City apparently waited six months during discovery negotiations to tell her that she needed to take additional steps to obtain IPRA documents. She subpoenaed IPRA, and IPRA produced nothing and sent her back to the corporation counsel's office. The City then agreed to the entry of an order enforcing the subpoena and took an additional month to communicate its intent to prepare a privilege log. The City's cavalier attitude toward the discovery process and nonopposition to enforcing the subpoena, expressed by Hurd in open court, warrant findings of willfulness, fault, and bad faith, and the City has therefore waived its privilege claims. *See id*.

**C. Scope of Subpoena and Burden of Responding**

In addition to waiver, the parties disagree about what documents are responsive to the subpoena. "The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Graham v. Casey's Gen. Stores*, 206 F.R.D. 251, 253 (S.D. Ind. 2002) (citing *Jackson v. Brinker*, 147 F.R.D. 189, 193–94 (S.D. Ind. 1993)). The parties' dispute boils down to two issues. First, they disagree about whether the subpoena calls for production of documents created after IPRA closed its formal investigation and posted its report summarizing the investigation on January 21, 2014.[5] It does. Second, the court must decide whether the City must produce the documents it has withheld as nonresponsive to the subpoena. (*See* Silva Aff. ¶ 40) (qualifying claim that all responsive documents have been produced "based on my understanding of [the subpoena']s plain meaning"). The City has not carried its burden to show that those documents are irrelevant or producing them would be unduly burdensome, and so they must be produced.

1. The City Must Produce Responsive Documents Created After IPRA Closed Its Formal Investigation

The subpoena's plain language requires the production of documents created after IPRA posted its investigative report on January 21, 2014. The city supports its reading of the subpoena with one of Black's Law Dictionary's definitions of the word investigate: "[t]o inquire into (a matter) systematically; to make (a subject) the subject of a criminal inquiry" or "[t]o make an official inquiry." Black's Law Dictionary 844 (8th ed. 2004). The word "investigate" does not

---

[5] IPRA formally closed its investigative file on January 3, 2014. (Silva Aff. ¶ 7.) In it surresponse, the City clarifies its position: January 21, 2104, the date on which the City posted its investigative summary on its website, marks the last date on which documents responsive to the subpoena were created. (ECF No. 168 at 2–3.) Read in context, the plaintiff's reply acknowledges the dates on which the investigative file was formally closed, but it does not concede the correctness of the City's position. (*See* Reply 2, ECF No. 161.)

necessarily specify the form of the official inquiry undertaken, however, and so the word may, in its ordinary sense, denote informal efforts as well as an agency's formal investigative process. *See Brotherhood of Ry. and S. S. Clerks, Freight Handlers, Exp. and Station Emp. v. Ass'n for Benefit of Non-Contract Emp.*, 380 U.S. 650, 661–62 (1965) (construing agency's statutory duty to investigate and stating that the "investigation is essentially informal, not adversary; it is not required to take any particular form." (Citation and quotation marks omitted). Silva's affidavit specifies the dates of the formal investigation, but it does not say that IPRA cannot take informal action within the scope of its responsibilities on the Young shooting because the formal investigation is closed. (*See* Silva Aff. at 1.) Thus, documents created after IPRA formally closed the Young investigation must be produced under the subpoena if they are nonetheless relevant to IPRA's informal inquiry into the Young shooting. For instance, Silva's affidavit states that the file has not been reopened. (Silva Aff. ¶ 9.) Documents created while considering whether to reopen the Young investigation would be potentially discoverable as involving an informal inquiry into IPRA's substantive conclusions about the Young shooting.

The City has good reason to understand that Plaintiff's discovery requests are not limited by the dates of its formal investigation. *See S.E.C. v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 543 (7th Cir. 2012) (citing *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1038 (7th Cir. 1995)) (explaining that context can dispel any ambiguity in an order and make it reasonably clear enough to enforce in contempt proceeding). Since at least October 2015, Plaintiff has stated in court filings that her discovery requests sweep more broadly than the contents of what IPRA has designated the official investigative file. *See* ECF No. 113 at 2 (stating in the motion to compel that Plaintiff "is seeking all documents relative to the shooting of Divonte Young and the subsequent investigation"). The City's production of videos of an interview not in that file in

2015 further confirms that the City knew that Plaintiff is seeking documents not in the file.

Given this context, the subpoena's request for documents was not limited by IPRA's unilateral

designation of the dates marking the formal beginning and end of the Young investigation. Nor is

the court's preservation order entered September 21, 2016.

2.  The City Has Not Carried its Burden to Show That the Documents It Has Withheld Are

Irrelevant Or That Producing Them Would Be Unduly Burdensome

The City also contends that the approximately 400 documents it has withheld are

nonresponsive because they are unrelated to its investigation of the Young shooting.  According

to the City, reviewing all of the purportedly nonresponsive documents to determine whether any

are privileged would be unduly burdensome.  It has not borne its burden to establish either

proposition, however.

The City bears the burden to show that the purportedly nonresponsive documents should

not be produced.  "The party opposing discovery has the burden of showing the discovery is

overly broad, unduly burdensome, or not relevant." *Pac. Century Int'l, Ltd. v. Does 1-37*, 282

F.R.D. 189, 193 (N.D. Ill. 2012) (quoting *Williams v. Blagojevich*, No. 05 C 4673, 2008 WL

68680, at *3 (N.D. Ill. Jan. 2, 2008).  The objecting party must meet its burden "with

specificity." *Miller*, 2010 WL 1754028, at *15 (citing *McGrath v. Everest Nat'l Ins. Co.*, 625 F.

Supp. 2d 660, 670 (N.D. Ind. 2008)).

To prove that the documents it has withheld are irrelevant, the City has submitted two

sample e-mail messages and an excerpt of a spreadsheet summarizing the allegedly

nonresponsive documents.  In correspondence with Gorman, attorneys from the firm hired by the

City repeatedly provided examples of responses to FOIA requests from members of the press

that it deems nonresponsive. *See, e.g.*, E-mail from P. Rocks to Gorman, Sept. 19, 2016, Ex. G

(providing example of three lines listing Young-related case files on a 51,000-line spreadsheet of matters handled by IPRA). The City has also filed an excerpt of a spreadsheet with approximately 397 rows of allegedly nonresponsive records of e-mail communications that it has withheld. (ECF No. 156-2, Ex. H.). The City's evidence fails to carry its relevance burden for two reasons.

First, the City has left the court unable to determine that the content of the discovery it has withheld is as unresponsive as the City believes the email messages' subject lines to be. None of the City's exhibits clarify whether each row of the spreadsheet corresponds to exactly one or more than one record in the electronic discovery software that produced the spreadsheet. Assuming that is the case, the subject lines of some of the e-mail messages listed on the excerpt can be fairly characterized as consistent with FOIA-related communications, but more than half of the subject lines in the spreadsheet on file are blank. The City has provided no guidance for deciphering the spreadsheet's column headings or identifying the e-mail addresses listed. More importantly, the City has provided only two sample e-mail messages. The City gives the court no way to determine how representative these samples are. *See Hannah's Boutique v. Surdej*, No. 13-CV-2564, 2014 WL 1227936, at *3 (N.D. Ill. Mar. 25, 2014) ("Defendants' response-by-example is evasive and incomplete.").

Second, it is unclear that the City's spreadsheet accounts for all of the withheld records in even a cursory fashion. According to IPRA's counsel at Jackson Lewis, Silva's e-mail query on July 7, 2016, yielded 972 total records. (E-mail from Elan Shpigel to Gorman, Aug. 26, 2016, ECF No. 149-2 at 2.) Of those, 88 were deemed responsive, and all but five (subject to a privilege claim) were produced. (*See* E-mail from Elan Shpigel to Gorman, Sept. 1, 2016, ECF No. 149-2.) That production left 884 records (972 total minus 88 produced or subject to a

privilege claim) unaccounted for. The City's spreadsheet excerpt in the record contains approximately 397 rows. (See ECF No. 156, Ex. H) Subtract those 397 records form the 884 deemed nonresponsive, and 487 (or approximately fifty-five percent) of the records remain unaccounted for after the spreadsheet is considered. *See Miller*, 2010 WL 1754028 , at *15 (granting motion to compel production because the responding party "failed to address whether training logs exist since September 2007, and/or predating that time, or whether it has within its possession, custody, or control documents related to the canine's certification in drug detection").

Accordingly, the City has not carried its burden to show that the documents it has withheld are irrelevant or that producing them would be unduly burdensome. Though the City has offered to allow Gorman to spot check a limited number of documents, *e.g.*, E-mail from P. Rocks to Gorman, Oct. 4, 2016, ECF No. 149-10, Ex. J, Plaintiff has refused this offer. The City has provided the court with a list, the meaning of which is unclear. That is, the City has left the court without enough information to evaluate its relevance claims in even a cursory manner. *See Hannah's Boutique*, 2014 WL 1227936, at *3; *Miller*, 2010 WL 1754028 , at *15. Finally, as for undue burden, the City has waived its privilege claims, and the only burden the City claims it will have to bear as a result of production—a privilege review—will therefore be no burden at all.[6]

---

[6] Among the exhibits accompanying the City's surresponse is an e-mail communication purporting to be the entire spreadsheet of withheld documents. (ECF No. 168-1 Ex. Q.) The City's counsel sent that spreadsheet to Gorman two days after it filed its response to the instant motion on November 11, 2016. (*See id.* at 1.) The City relies on that exhibit to argue that the City has not attempted to limit which documents Gorman could select for spot checking. (*See* Proposed Surresponse 4–5, ECF No. 168-1.) That is, the City does not rely on this evidence to support its position on the relevance of the withheld documents. (*See id.*) Nor could it. The surresponse gives no reason why the City could not have filed the entire spreadsheet earlier. A surreply cannot be used to get a second chance to respond to an issue that was fully briefed in the motion, response, and reply; the surreply generally acts as a procedural safety valve, giving a party who responded to a motion a chance to respond to arguments raised for the first time in the reply. *See Williams v. Anthony*, No. 12 C 4275, 2012 WL 6680320, at *2 n.* (N.D. Ill. Dec. 21, 2012) (collecting cases and striking surreply because "[t]he surreply provides no explanation as to why [the party who responded to the motion to dismiss] did not raise this argument in his opposition brief, and the court sees none"). Accordingly, considering Exhibit Q to the City's surresponse on the questions of relevance and undue burden would be improper.

## D. A Hearing is Required on the Plaintiff's Request for Attorney's Fees

Having resolved the parties' disputes about waiver and the scope of the subpoena, the court turns finally to Plaintiff's request for her reasonable attorney's fees. Rule 37(a)(5) provides that:

> If [a motion to compel a party's response to a request for production of documents] is granted – or if the disclosure or requested discovery is provided after the motion was filed – the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's non-disclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A). The party that loses a motion to compel must show that its position was substantially justified. *See Rickels v. City of South Bend*, 33 F.3d 785, 787 (7th Cir.1994) ("A loser may avoid payment by establishing that his position was substantially justified."). Shifting fees in discovery disputes "encourages their voluntary resolution and curtails the ability of litigants to use legal processes to heap detriments on adversaries (or third parties) without regard to the merits of the claims." *Id.* Attorney fees can also be awarded as a sanction when a motion to enforce a subpoena is granted under Rule 45. *See, e.g.*, *Loparex, LLC v. MPI Release Techs., LLC*, No. 1:09-CV-01411-JMS-TAB, 2011 WL 2066666, at *1 (S.D. Ind. May 25, 2011) (considering fee petition after "award[ing] Defendants their attorney's fees for having to chase

---

Moreover, the City's original spreadsheet excerpt and the spreadsheet sent November 11, 2016, both consist of ten pages, but because the latter spreadsheet has several additional columns, each row takes two pages to print. (*Compare* ECF No. 168-1 Ex. Q, *with* ECF No. 156 Ex. H.) The November 11, 2016, spreadsheet has approximately 105 rows. The City has made no effort to explain why a spreadsheet that supposedly accounts for more records has fewer rows than the earlier-filed excerpt of it. Perhaps rows do not denote records. Perhaps an answer can be found by interpreting the significance of a nonobvious column heading like "Control Number, "Group Identifier," "Date Time Primary Document," "Is Parent," or "Record Type." The City provides no guidance on interpreting either spreadsheet, however, leaving the court to guess. It is too late for the City to leave matters in this state of confusion. Thus, for the reasons stated in the text, the city has not discharged its burden.

down documents in Minnesota—via a contested third-party subpoena—that Plaintiff Loparex, LLC, should have produced itself during discovery"); *Robinson v. Moran*, No. 06-CV-3058, 2007 WL 2915620, at *3 n.3 (C.D. Ill. Oct. 5, 2007) (declining to award fees based on facts of case but acknowledging power to award fees). When awarding fees, the court must "examine[] the hours billed and the rates charged" to determine whether the fees are reasonable. *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

This record's ambiguity about the City and IPRA's relationship and Plaintiff's request for a rule to show cause hinders the court's ability to decide Plaintiff's request now. The City devotes little, if any, of its response to the propriety of awarding fees—under Rule 37 or 45—if it were to lose the motion. Its recitation of the rule-to-show-cause standard raises at least the possibility that it reasonably believed it would have a chance to address those issues at a hearing. *See Hyatt*, 621 F.3d at 692–93 (discussing Due Process right to notice and opportunity to be heard before contempt sanctions are imposed). Consequently, and out of an abundance of caution, the court will set a hearing rather than resolve Plaintiff's request for attorney's fees now.

### III. Conclusion

For the reasons given above, the Court grants Plaintiff's amended motion for a rule to show cause (ECF No. 149), the City's motion for leave to file a surresponse to that motion (ECF No. 168), and Plaintiff's motion for leave to file a surreply (ECF No. 172). Consistent with the court's rulings, the court orders the City to produce all of the records that it has withheld as privileged or nonresponsive to Plaintiff's subpoena dated May 6, 2016. The City must produce records in compliance with this order by January 10, 2017. A hearing is set for January 25, 2017, at 10:00 a.m., at which time the City will have the opportunity to show cause why the

court should not order it to pay Plaintiff's reasonable attorney's fees and expenses incurred in enforcing her subpoena dated May 6, 2016.

Date:   January 3, 2017

_____/s/_____

Joan B. Gottschall
United States District Judge