IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LaSHAWNDA YOUNG, Administrator of the Estate of Divonte Young, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 13 C 5651 |
| | ) ) | Magistrate Judge M. David Weisman |
| CITY OF CHICAGO, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant Otis Watts' motion for summary judgment [581] is denied. Status hearing set for 10/27/25 at 10:00 a.m. to set a trial date.

### Background

In August 2012, Chicago Police Officer Otis Watts was assigned to a citywide narcotics unit that sent teams of officers into areas where citizens had complained of drug activity. The teams would set up surveillance, attempt to buy drugs, and arrest the dealer if the purchase was successful. On August 9, 2012, Watts and five other officers were stationed in Chicago's Englewood neighborhood. Watts was sitting in an unmarked SUV conducting surveillance in the late morning when he heard gunshots. After exiting his vehicle, Watts returned fire. Divonte Young was killed during the gunfight. It is undisputed that Watts killed Young, whose mother, LaShawnda Young, filed the instant suit on behalf of the estate of Divonte Young, alleging excessive force and a *Monell* claim against the City of Chicago.

Watts contends that he is entitled to summary judgment on Plaintiff's excessive force claim because his use of deadly force constituted a reasonable act in self defense and to prevent escape in defense of others, and in any event, he is entitled to qualified immunity because his conduct did not violate a clearly established constitutional rule at the time of the shooting.

### Standard

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), quoting Fed. R. Civ. P. 56(c); *see also Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is

material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine dispute as to a material fact). "Genuine issues of material fact are not demonstrated by the 'mere existence of some alleged factual dispute between the parties,' *Anderson*, 477 U.S. at 247, or by 'some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)."

**Analysis**

**A. Excessive Force**

To assess whether police used excessive force in violation of the Fourth Amendment, courts ask "whether the officers' actions [were] objectively reasonable in light of the totality of the circumstances." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In applying this standard, courts are "mindful that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Flournoy v. City of Chi.*, 829 F.3d 869, 874 (7th Cir. 2016) (quoting *Graham*, 490 U.S. at 396-97). "[W]hen an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (citation and internal quotation marks omitted). "If the suspect threatens the officer with a weapon, deadly force may be used." *Sanzone v. Gray*, 884 F.3d 736, 749-50 (7th Cir. 2018) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1146, 1150 (7th Cir. 1994)).

When material facts about the totality of circumstances surrounding the shooting remain disputed, a jury must resolve these disputes and determine whether the officer acted reasonably. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). However, "if there are sufficient undisputed material facts to establish that the officer acted reasonably under the circumstances, then the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). "When an officer who used deadly force is the only possible witness, a decedent's estate is unlikely to succeed unless physical evidence contradicts the officer's account." *Estate of Logan v. City of S. Bend, Ind.*, 50 F.4th 614, 615 (7th Cir. 2022). "Disbelief of the only witness is not proof that the opposite of the witness's statements is true; disbelief would mean that the record is empty, and on an empty record the plaintiff loses, because the plaintiff has the burdens of production and persuasion." *Id.*

With this background, the Court details the following events as described by Watts. While Plaintiff challenges numerous portions of Watts' statement of facts about the following events, only disputes with material facts will be noted here. On August 9, 2012, Watts was sitting in an unmarked police SUV at approximately 10:30 a.m. conducting surveillance on a building at 6238 S. Honore, in the Englewood neighborhood of Chicago. (Watts Dep., Dkt. # 587-2, at 135-36.)

(Def.'s Stmt. Facts, Dkt. # 586, ¶¶ 7-9.)  Several other members of the surveillance team were parked close by.  While sitting in his car, Watts testified that he observed what he believed to be a "small narcotics dope spot right down the block," (Watts Dep., Dkt. # 587-2, at 156), and a young man on a 10-speed bike riding back and forth.  (*Id*. at 156-58.)  Surveillance footage from Sam's MiniMart, which was located behind Watts' SUV, shows significant vehicular and pedestrian traffic in the hour leading up to the shootout. (Def.'s Stmt. Facts, Dkt. # 586, ¶ 66.)[1]

Watts testified that as a young couple with a stroller was approaching the back of his car, he heard a gunshot, turned his head in the direction of the sound, and saw a man in red across the street pointing a gun in his direction.  (*Id*. ¶ 17.)  Watts yelled "shots fired" into his police radio and rolled out of his driver's side door.[2]  (*Id*. ¶ 18.)  Watts unholstered his weapon and began to yell "police" and "drop the gun," and Young fired another shot toward the rear of the Watts' SUV.  (*Id*. ¶ 21, 22).  Young did not drop his gun, fired another round towards the Minimart, and began to turn the gun towards Watts.  (*Id*. ¶ 24.)  Watts fired three rounds in rapid succession, causing Young to flee toward the alley.  (*Id*. ¶ 25.)  Young turned once more, squaring his torso to Watts, and Watts again fired his weapon and continued to fire as he ran towards the alley where he had seen Young running.  (*Id*. ¶¶ 27-29.)  After Watts fired his last round and Young had disappeared from his line of sight, Watts saw a young man on a bicycle riding in Young's direction at a high rate of speed."  (*Id*. ¶ 30.)

Certain witness testimony generally corroborates Watts' version of events.  Laura Moore, the mother of Young's child, told detectives during a videotaped interview conducted on the day of the shooting that earlier that day, around the time of the shooting, she was in Sam's MiniMart with a friend.  The friend had called Young while Moore was arguing with Garland Jackson inside the store, which was located behind Watts' SUV.  Shortly thereafter, while walking outside of

---

[1]  Plaintiff attempts to refute the accuracy of several of these facts, but it is not clear that the challenged facts are material to the excessive force inquiry.  In any event, Plaintiff's alleged inaccuracies are not well-placed.  For example, Plaintiff asserts that no individuals with a baby stroller were identified or deposed, the detective investigating the shooting, Detective Scannell, testified that Watts never mentioned a couple with a stroller, and the preliminary report from IPRA relating to the statement Watts gave to OCIC Chris Fletcher makes no mention of a baby stroller. (Pl.'s Resp. Def's. Stmt. Facts, Dkt. # 605, ¶ 14.)  Nevertheless, as noted, surveillance footage from Sam's MiniMart shows significant vehicular and pedestrian traffic in the hour leading up to the shootout and a couple with a baby stroller walking near 63rd and Honore, and Louis Woods testified that a man near the corner of the church on 63rd and Honore started firing a gun at Sam's MiniMart, forcing a woman and her infant child to take cover.  Thus, whether a couple with a stroller were in the vicinity or not is not material.  It is undisputed that there were people in the area at the time of the shooting.  Plaintiff contends that Watts did not tell CPD investigating Detective Scannell that Young shot a gun at him. (Pl.'s Resp. Def's Stmt. Facts, Dkt. # 605, ¶ 17.)  But Scannell testified that Watts told him that Young was "shooting in his direction." (Scannell Dep., Dkt. # 609-14, at 65-66.)

[2]  According to Plaintiff, Officer John Lewis testified that the first call of "shots fired" came from team member Officer Hoffman. (Pl.'s Resp. Def's Stmt. Facts, Dkt. # 605, ¶ 18.)  The Court does not find this purported discrepancy to be a material fact in the context of the excessive force inquiry.

Sam's MiniMart, Moore heard gunshots coming from the church on the southwest corner of 63rd and Honore, looked in that direction, and saw Young and another man and knew that it had to be one of them shooting.[3] (Def.'s Stmt. Facts, Dkt. # 586, ¶¶ 61-62.) Garland Jackson, who was walking near Moore, testified that he heard gunshots coming from the south side of Honore, looked in that direction and saw Young in a red shirt and another male on the sidewalk shooting in Jackson's direction, while a police officer was getting out of his car. (*Id.* ¶¶ 47-48.) Jackson saw another male standing near Young. (Jackson Dep., Dkt. # 590-18, at 47-48.) Theopolis Collins, who was driving by Watts at the time of the shooting, testified that the officer was still inside his vehicle when Collins first heard the gunshots. (Def.'s Stmt. Facts, Dkt. # 586, ¶ 59.) Louis Woods testified that a man near the corner of the church on 63rd and Honore started firing a gun at Sam's MiniMart, forcing a woman and her infant child to take cover. (*Id.* ¶ 55.)[4] Surveillance footage from Sam's MiniMart shows significant vehicular and pedestrian traffic in the hour leading up to the shootout as well as the altercation between Moore and Jackson and a couple with a baby stroller walking near 63rd and Honore. (*Id.* ¶ 66.) Plaintiff denied Watts' statement of facts as to Woods, noting that during his deposition, Woods testified he never saw the shooting and was never near the scene of the shooting. (Pl's. Resp. Watts' Stmt. Facts, Dkt. # 605, ¶ 54.)

Evidence technicians recovered thirteen .45 caliber shell casings near the driver's side of Watts' vehicle and three .22 caliber shell casings near the corner of the church. (*Id.* ¶¶ 40-41.) Evidence technicians also photographed damage to both Sam's MiniMart and a car parked in front of the MiniMart that could have been the result of a bullet strike. (*Id.* ¶ 42.) Forensic scientists determined that the three .22 caliber shell casings were fired from the same gun. Moreover, a primer gunshot residue test that had been administered to Young's hands came back positive,

---

[3] Plaintiff objects to Moore's testimony based on admissibility concerns. For purposes of this motion, the Court overrules this objection as Moore's testimony fits comfortably in the exception for admissibility under Federal Rule of Evidence 807 (residual exception) limited to the facts that Moore had an encounter with Garland Jackson at the MiniMart and that the shots being fired at the time Officer Watts discharged his weapon came from Young's general direction (not necessarily from Young). The statements are generally consistent with Garland's testimony, Moore had no motive to falsely implicate Young, and Moore's testimony is consistent with other witnesses' testimony. The Court will entertain further argument as to the admissibility of these statements for any trial at a later date.

[4] Plaintiff further denied Watts' statement of facts as to Woods, asserting that during his deposition, Woods admitted to having lied to the police and having at least one, if not two, perjury convictions, and proceeded to assert this Fifth Amendment right not to incriminate himself at the deposition. (Woods Dep., Dkt. # 587-20, at 56-57.) Beyond the fact that Woods's testimony on his criminal history is muddled at best, the Court accepts that Woods may be subject to cross examination at trial based on various considerations in his background. Because Woods's testimony is used here simply to corroborate that a shooting occurred at the MiniMart, and not who was involved in the shooting or other details related to the shooting, Plaintiff's objections are overruled. *See Carroll v. Lynch*, 698 F.3d 561, 566 (7th Cir. 2012) ("neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment") (citation and internal quotation marks omitted).

demonstrating that Young either discharged a firearm, contacted a gunshot residue-related item, or was in the environment of a discharged firearm. (*Id.* ¶¶ 43-44.)

"To ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020). "[T]he [Administrator] as the party opposing summary judgment retains the burden of presenting evidence that creates a dispute of material fact for a finder of fact to resolve." *Estate of Lewis v. Fuertes*, No. 19 C 3466, 2022 WL 602236, at *5 (N.D. Ill. Mar. 1, 2022) (quoting *Estate of Green v. City of Indianapolis*, 854 F. App'x. 740, 746 (7th Cir. 2021) and citing *Muhammed,* 316 F.3d at 683-84 (asserting that to preclude summary judgment in deadly force case, plaintiff must "provide specific evidence when attacking [officers'] credibility, such as contradictory eyewitness accounts or other impeachment evidence")).

Plaintiff claims that a question of fact exists as to whether the force used by Watts was reasonable because no gun was found on or around Young, and he posed no threat to Watts or others.[5] As an initial matter, as stated in *Sherrod v. Barry,* 856 F.2d 802, 804-05 (7th Cir. 1988) (*en banc*),

> When a jury measures the objective reasonableness of an officer's actions, it must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in responding to that situation. Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise, as the trial court ruled in this instance, the jury would possess more information than the officer possessed when he made the crucial decision.

The Seventh Circuit cautioned that its holding was not a "black-letter rule," and that after-the-fact evidence could be used to test a witness's credibility, namely the ability of the witness to "observe, remember, or narrate," and could also be used to impeach a witness. *Id.* at 806. Therefore, the Court addresses the evidence that Plaintiff contends refutes Watts' version of events.

---

[5] Plaintiff asserts that Young was a devoted father who "avoided gangbanging," worked as a cook at Sam's MiniMart, and was planning to take his young daughter and move in with his mother in Bolingbrook, Illinois. (Pl.'s Resp., Dkt. # 608, at 3-4.) While the Court does not understand Plaintiff to be contending that Young was an innocent bystander, to the extent that Plaintiff's observations could be interpreted as an argument that Young was accidentally shot, he was not seized under the Fourth Amendment. *See Van Blair v. Rush Cnty. Sheriff's Dept.*, No. 1:22-CV-01215-RLY-MG, 2024 WL 2972529, at *5 (S.D. Ind. May 7, 2024) ("As the Supreme Court has made clear, accidental contact, even accidental contact that restrains the freedom of a person to walk away, is simply not within the purview of the Fourth Amendment.").

Plaintiff states that Watts' account is contradicted by statements attributed to Chris Fletcher in a preliminary report drafted by IPRA investigator Margarita Galindo. While this discrepancy would provide Plaintiff with a good faith basis to cross-examine Watts, Galindo's report of Fletcher's statements of Watts's statements is hearsay and therefore does not raise a material issue of fact. *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) ("Police reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer") (citing Fed. R. Evid. 803(8), advisory committee notes). Here, Fletcher's statements are not an officer's firsthand observations as memorialized in a report.

In an apparent attack on Watts' credibility, Plaintiff generally notes that during the tape-recorded interview, the FOP representative whispered several times to Watts, Galindo occasionally turned off the tape recorder at the request of the FOP representative, and at times, Watts and his FOP representative left the room for private conversations. According to Plaintiff, Watts proffered differing accounts of the shooting immediately after the incident and then the next day at the IPRA interview. Specifically, Plaintiff asserts that at the IPRA interview, Watts stated that Young was standing at the rear corner of a church that was located at the corner of 63rd Street and Honore, where three .22 shell casings were found, rather than standing in the middle of Honore. (Pl.'s Resp., Dkt. # 608, at 11.) Plaintiff points out another purported contradiction in the IPRA interview, with Watts claiming that Young was shooting in the direction of the rear of Watts' car and that Young swerved his body and pointed the gun in Watts' direction. (*Id.* at 12.) Plaintiff further notes that Watts also stated at the IPRA interview that he did not follow Young up the alley and instead stayed at his car. (*Id.*) Finally, Young contends that after prompting by the FOP representative, Watts stated at the IPRA interview for the first time that he was in fear of his life. (*Id*. at 14.) While these alleged discrepancies might be available at trial to impeach Watts' version of events, summary judgment should not be denied based on a party's desire to pursue cross-examination. *See Carroll,* 698 F.3d at 566.

Plaintiff also points out that Watts never told Detective Scannell, the lead detective for the city investigating this shooting, that Young pointed a gun at him a second time. (Pl.'s Ex. 14, Scannell Dep., at 66:5-67:4.), and that Scannell admitted at his deposition that Watts never explicitly told him that Plaintiff was shooting at him. But Scannell testified that Watts told him that Young was "shooting in his direction." (*Id*. at 65-66.) Any discrepancy is not material.

Plaintiff next refers to the testimony of Theophilis Collins, who was driving past Watts' SUV at the time of the shooting and stated that he did not hear Watts announce his office or direct the shooter to put down the gun. The Court "must consider the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). Even assuming arguendo that Watts did not issue a verbal warning to Young, shots were being fired at or very close to the time he exited his vehicle. "*Garner* requires an officer to warn 'where feasible' but does not require an officer to warn under all circumstances." *Id*. at 952 (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Given the life-threatening situation Watts encountered over a span of seconds, the Court concludes that a warning was not feasible.

6

Plaintiff also relies on the testimony of Collins and Belinda Parker to challenge Watts' contention that Young had a gun. Collins testified he saw three young men running up the alley, then saw Young running through the lot towards the alley. Collins could not tell if the three men were with Young but stated that the entire time he saw Young, Young was running, first towards the alley and then west down the alley. Notably, Collins testified that he was not able to see Young's hands and was not able to keep his eyes on what Young was doing the entire time.[6] So, Collins' testimony does not refute Watts' contention that Young had a gun. Belinda Parker, who knew Young and his family and was inside her home at 6315 S. Wolcott when she heard gunshots, also testified that she did not see Young with a gun. Parker ran outside when she heard her son yell that Young had been shot. (Def.'s Stmt. Facts, Dkt. # 586, ¶ 65.) Parker called to Young who turned, collapsed in Parker's arms, and died minutes later. But, as Watts notes, Parker did not see Young until after the shooting, so her testimony does not contradict Watts' account that Young was the individual who was shooting.

Thus, while much of the evidence Plaintiff relies on does not create a genuine issue of material fact, Plaintiff has at least two facts supporting her assertion that Divonte Young was not the shooter. Most important, Plaintiff points out that no gun was ever recovered. The failure to find a gun at the scene based on the undisputed facts presented here creates a material issue of fact sufficient to deny summary judgment. First, it is undisputed that Young ran from the initial location of the shooting and was not observed for a period. (Pl.'s Resp. Def's Stmt. Facts, Dkt. # 605, ¶¶ 26, 27.) Watts's fellow officers responded to the "shots fired" call. When Young was found motionless in the alley, Sergeant Behling, the officer in charge, saw only two people near Young, (*id.* ¶ 35), and there is no suggestion that either of those individuals secreted a gun from the scene. A reasonable jury, given the apparent promptness of the responding officers to observe and secure the scene where Young was found and the ensuing search of the surrounding area, could conclude that Young was not armed. Conversely, a jury could also conclude, based on the totality of evidence, that Young was armed, discharged his weapon as described by Watts, and a firearm simply was not found.[7]

Further, while hotly contested by the parties, Plaintiff offers expert opinion testimony from David Balash asserting that there was inconsistent physical evidence as to the location of the shooter and the direction in which Watts was shooting and the location of recovered cartridges was inconsistent with the expert's experience as to how an unknown .22 firearm would discharge cartridges. Watts asserts in his reply brief that certain of Mr. Balash's opinions are unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993), including those regarding: the location of the .22 caliber shells; the composition of the .22 caliber shells; the

---

[6] Although Collins testified he did not see Young with a gun (Collins Dep., Dkt. # 587-23, at 34:10-15; 51:14-24; 72:1-24), Collins further testified that Young was running the entire time Collins saw him, (*id*. at 34:3-5), and Collins could not see Young's hands (*id*. at 113:2-7.) In addition, Collins testified he did not see Young gesture at Watts, turn around, or stop. (*Id*. at 51:14-24; 73:2-7.)

[7] As previously noted, "[w]hen an officer who used deadly force is the only possible witness, a decedent's estate is unlikely to succeed unless physical evidence contradicts the officer's account." *Estate of Logan*, 50 F.4th at 615. The Court finds that the lack of a gun constitutes "physical evidence" in this context.

positive test for the primer gunshot residue; and the level of force that Watts used.  Plaintiff filed a response to the *Daubert* challenge, as directed.  While Defendant seeks to exclude Mr. Balash's opinions, for purposes of this motion, the Court finds exclusion is appropriate only to the extent described below.

"Federal Rule of Evidence 702 allows an expert qualified by knowledge, skill, experience, training, or education to opine on relevant matters that assist the jury in determining a fact at issue." *Narsimhan v. Lowe's Home Centers, LLC*, No. 19 CV 1255, 2022 WL 952443, at \*4 (N.D. Ill. Mar. 30, 2022). "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (noting that "'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert") (citation omitted); *see also United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017), *modified on different grounds, United States v. Jett*, 908 F.3d 252 (7th Cir. 2018) (stating that the defendant's "focus on scientific-reliability factors is misplaced" when the detective's "expert testimony was based on his extensive training and experience. . . . [which] are proper foundations for expert testimony").  "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).  Moreover, the Supreme Court has noted that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Id.* at 158.

As to the location of the .22 caliber shells, Mr. Balash opined that in this case, the ejection pattern of the shells was inconsistent with the ejection pattern of a .22 caliber gun.  It is true, as Watts argues, that Balash testified that he did not perform an ejection test in this case, but he also testified that over the course of his career, he has viewed hundreds of ejection patterns with .22 caliber rimfire cartridges and has repeatedly observed ejection patterns from a .22 caliber pistol. (Balash Dep., Dkt. # 609-17, at 90; 222-23.)  In light of Mr. Balash's 26 years of experience with the Michigan State Police from 1966 to 1992, both as a road trooper and in a forensics lab, the Court finds that he possesses the experience to testify as to ejection patterns.  To the extent Defendant believes that Balash's qualifications are thin or irrelevant, or that his opinion on ejection patterns of .22 caliber pistols is inaccurate, Watts is free to cross-examine him in this regard.  *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  The same is true regarding Mr. Balash's opinions that .22 caliber shells were not the source of the gunshot residue found on Young's hands and clothes. Watts contends that this opinion is pure speculation, and that Mr. Balash admitted that .22 caliber rimfire could contain all three ingredients (barium, antimony and lead).  (Balash Dep., Dkt. # 609-17, at 143-44; 155.)  Watts may bring these points out on cross-examination.

Notably, however, Mr. Balash opines that the report from the Illinois State Police Laboratory regarding the analysis of Young's hands stating that Young "discharged a firearm, contacted a PGSR [Primer Gunshot Residue] related item or had both hands in the environment of

a discharged firearm" should have stated "or came into contact with an item or items containing [PGSR] particles." (Balash Opinion, Dkt. # 609-18, at 12.) Thus, there is no dispute that Young was exposed to PGSR. The only issue is how it got there. As to that point, Mr. Balash offered no definitive opinion, but rather possibilities. (Balash Dep., Dkt. # 609-17, at 174-75.) In fact, Mr. Balash succinctly testified he did not know one way or another whether the PGSR came from Young's actual exposure to PGSR or from contamination, but he did not dispute that PGSR was found on Young's body. (*Id*.) Thus, Mr. Balash's testimony confirms that PGSR was found on Young, and his hypothesis of possible contamination does not create a material fact of dispute as it is mere speculation. *See Estate of Green v. City of Indianapolis*, 854 F. App'x 740, 746–47 (7th Cir. 2021) ("speculation is not a valid basis for a judgment in the [plaintiff's] favor or for defeating the officers' motion for summary judgment"); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (granting to party opposing summary judgment the benefit of all reasonable inferences does not extend to inferences that are supported only by speculation or conjecture).

While not overwhelming, the disputed forensic evidence, the failure to find a weapon without any plausible explanation for such a result, and considering the reasonable inferences that the Court must draw in Plaintiff's favor at summary judgment, the Court finds there are material issues of fact for a jury to resolve as to Plaintiff's excessive force claim. In short, the undisputed facts, with reasonable inferences drawn in Plaintiff's favor, show that Young was in the vicinity of the empty lot from which gunshots were fired in the direction of others. Officer Watts observed the shooting in real time and discharged his weapon multiple times at Young, who ran from the scene. Watts continued to shoot at Young as he fled, believing that he was armed. When Young was found by responding officers, he was not armed, and Defendants have not proffered an undisputed explanation as to what happened to any gun that Young may have possessed. Accordingly, summary judgment on the excessive force claim is denied.

### B. Qualified Immunity

Watts also argues he is entitled to summary judgment because his actions were protected by qualified immunity. "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Whether qualified immunity applies turns on two questions: First, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (per curiam).

As noted *supra*, we find that there are material facts in dispute that make summary judgment inappropriate. Assuming, without deciding that a constitutional violation occurred, we

consider whether the federal right at issue was clearly established at the time of the violation. *See Smith v. Finkley*, 10 F. 4th 725, 755 (7th Cir. 2021) ("Finally, it's important to note that under *Pearson*, 555 U.S. at 236, 129 S.Ct. 808, we have the discretion to skip the first step in the qualified-immunity framework and assume without deciding that a constitutional violation occurred (or that a jury might reasonably so conclude) and move directly to the second step in the analysis.") (Sykes, J., dissenting).

As to the second, Watts does not argue that he made a reasonable mistake based on the circumstances presented to him in a quickly evolving situation and thus shot at Young because he reasonably albeit wrongly believed that Young was armed when in fact another individual with Young was armed. Because genuine issues of material fact exist as to whether Young was armed at the time Watts fired his weapon, the Court finds that summary judgment on the issue of qualified immunity is improper.

### C. Illinois Wrongful Death Act

Plaintiff also brings a wrongful death claim under the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 *et seq.* pursuant to which Plaintiff must show that Divonte Young's death was caused by a "wrongful act, neglect, or default." *Id.* For the reasons stated above, because questions of material fact exist as to Watts' conduct, summary judgment on Plaintiff's wrongful death claim is not appropriate.

The Court notes that Plaintiff's *Monell* claim remains pending and summary judgment has been partially briefed. In order to resolve at trial relevant factual issues and determine whether an underlying constitutional violation occurred, the *Monell* claim is dismissed without prejudice to renewal after trial.

### Conclusion

For the reasons set forth above, Officers Watts' summary judgment motion is denied. The parties are directed to meet and confer regarding trial dates in 2026. Status hearing set for 10/27/25 at 10:00 a.m. to set a trial date.

**Date:** October 16, 2025

M. David Weisman

**M. David Weisman**
**United States Magistrate Judge**